## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TREVOR R. WIBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-494-LPS-CJB |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **REPORT AND RECOMMENDATION**

Plaintiff Trevor R. Wiberg ("Wiberg" or "Plaintiff") appeals from the decision of Carolyn

W. Colvin, the Commissioner of Social Security ("Commissioner" or "Defendant"), denying his

claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433 & 1381-1383f.[1]  The Court

has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3).

Presently pending before the Court are cross-motions for summary judgment filed by

Wiberg and the Commissioner. (D.I. 21, 24)  Wiberg asks the Court to reverse the

Commissioner's decision and remand for further proceedings. (D.I. 22 at 20)  The

Commissioner requests that the Court affirm the Commissioner's decision. (D.I. 25 at 24)  For

the reasons set forth below, the Court recommends that Wiberg's motion for summary judgment

---

[1]     Carolyn W. Colvin became the Commissioner of Social Security on February 13,
2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of
Civil Procedure, Ms. Colvin replaced the previous Commissioner, Michael J. Astrue, as the
Defendant in this case. *See, e.g.*, *Malcom v. Colvin*, Civ. No. 12-584-SLR, 2013 WL 5365339, at
*1 n.1 (D. Del. Sept. 25, 2013).

be GRANTED-IN-PART and DENIED-IN-PART, that the Commissioner's motion for summary judgment be DENIED, and that the case be remanded for further proceedings consistent with this Report and Recommendation.

## I.   BACKGROUND

### A.   Procedural History

Wiberg filed applications for DIB and SSI on July 28, 2008, alleging that he became disabled on September 1, 2007. (D.I. 11 (hereinafter, "Tr.") at 125, 132; D.I. 22 at 2) On December 19, 2008, Wiberg's applications were denied. (Tr. at 91) Wiberg filed a request for reconsideration of his claims on January 23, 2009, and on May 26, 2009, his application was again denied. (*Id.* at 97, 102)

On June 1, 2009, Wiberg next filed a request for a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 115) Wiberg was represented by counsel at the hearing, which was held on July 15, 2010. (*Id.* at 10) On July 28, 2010, the ALJ issued a decision denying Wiberg's claims for DIB and SSI. (*Id.* at 7-22) On August 13, 2010, Wiberg requested review of the ALJ's decision by the Appeals Council. (*Id.* at 4) On April 5, 2011, the Appeals Council denied Wiberg's request for review. (*Id.* at 1) The ALJ's decision denying DIB and SSI thus became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *see also Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On June 3, 2011, Wiberg filed a Complaint in this Court seeking judicial review of the ALJ's decision. (D.I. 2) On July 17, 2012, Wiberg filed a motion for summary judgment. (D.I. 21) The Commissioner opposed Wiberg's motion and filed a cross-motion for summary judgment on August 13, 2012. (D.I. 24) On July 10, 2013, Chief Judge Leonard P. Stark

2

referred this case to the Court to hear and resolve all pretrial matters, up to and including the resolution of case dispositive motions. (D.I. 28)

## B. Factual Background

### 1. Plaintiff's Medical History and Condition

Wiberg was 22 years old at the time of the alleged onset of his disability in September 2007. He meets the insured status requirements of the Social Security Act through September 2008. (Tr. at 12) Wiberg alleges that he became disabled on September 1, 2007, and that he was unable to work as of that date due to the effects of Ehlers-Danlos syndrome, hypermobility type.[2] (*Id.* at 10, 149; D.I. 22 at 5) Ehlers-Danlos syndrome refers to a group of inherited disorders of the connective tissue that can cause, *inter alia*, instability and pain in one's joints. (D.I. 25 at 1 n.1); *see also Tietjen v. Astrue*, No. 11-CV-182-PJC, 2012 WL 3308399, at *1 n.1 (N.D. Okla. Aug. 13, 2012). It is a "rare disorder." (Tr. at 32, 390; *see also* D.I. 25 at 1 n.1)

### a. December 2007-January 2009: Visits with Dr. Robinson, Dr. Sabbagh, and Dr. Koval and related physician appointments

From December 2007 to January 2009, Wiberg sought treatment for back and neck pain from his primary care physician, Amy J. Robinson, M.D. In that time period, he also sought care from an orthopedic specialist, Ronald C. Sabbagh, M.D., and a rheumatologist, Norman S. Koval, M.D. (Tr. at 152, 208, 214, 308, 367)

---

[2]     Wiberg's disability insured status expired on September 30, 2008. (Tr. at 12) Therefore, for purposes of receipt of DIB only, the relevant period is from September 1, 2007, Wiberg's alleged onset date, to September 30, 2008. *Ashby v. Barnhart*, No. Civ.A. 02-1465, 2003 WL 22245142, at *1 n.1 (E.D. Pa. June 11, 2003) (citing 42 U.S.C. §§ 423(a)(1)(A) & (c)(1)(B); 20 C.F.R. § 404.131(a); *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990)). For purposes of receipt of SSI, the relevant time period is from Plaintiff's alleged onset date through July 28, 2010, the date of the ALJ's decision. *Ashby*, 2003 WL 22245142, at *1 n.1; *Dewees v. Sullivan*, CIV.A. No. 89-7694, 1990 WL 83360, at *2 (E.D. Pa. June 14, 1990).

3

On December 7, 2007, Wiberg sought treatment for back pain from Dr. Robinson. (*Id.* at 308) Wiberg stated that he had suffered from back pain since he fell off a skateboard at age 15 and that it had "gotten worse[,]" from there, due in part to having twisted his back while playing football and lacrosse in high school. (*Id.*) On December 12, 2007, Wiberg visited the Beebe Medical Center for examinations of the cervical spine, thoracic spine, and lumbar spine that Dr. Robinson had ordered. (*Id.* at 253) The examinations revealed possible sacroilitis (due to irregularity in the sacroiliac joints), but otherwise normal results regarding the cervical spine, thoracic spine and lumbar spine. (*Id.*)

On February 11, 2008, Wiberg called Dr. Sabbagh's office, stating that he was in severe pain because medication he had been prescribed did not help his condition; Wiberg said that the only thing he could do to relieve the pain was drink alcohol. (*Id.* at 214) Dr. Sabbagh advised against drinking alcohol while taking medication, and refused to prescribe any further medication due to Plaintiff's alcohol consumption; he directed Wiberg to his primary care provider or to the emergency room for medication. (*Id.*)

On February 13, 2008, Wiberg visited Satyajit Sarangi, M.D., for a lumbar spine MRI ordered by Dr. Sabbagh. (*Id.* at 348-49) Dr. Sarangi's ultimate conclusion after viewing the results of the MRI was that, except for a minimal disc bulge at L5-S1, the remainder of the levels appeared unremarkable for underlying disc herniation, central canal, or neural foraminal stenosis, and that portions of the S1 joints appeared to be free of underlying erosions. (*Id.* at 349)

On February 15, 2008, Wiberg returned to Dr. Robinson to follow up on his back pain. (*Id.* at 312) Wiberg reported that he could not sleep at night because of the discomfort, that he had a "baseline" of consistent back pain, and that he had quit his job during the previous month

4

due to that pain. (*Id.*) Dr. Robinson noted that there was no improvement in Wiberg's upper back pain or his right scapular pain, there was tenderness on the thoracic vertebrae, as well as paraspinal muscle spasm on the right. (*Id.*) Dr. Robinson also reported a normal range of motion of Wiberg's spines. (*Id.*)

On February 18, 2008, Wiberg visited the emergency room at the Beebe Medical Center, complaining of back pain and neck pain; after examination, the attending physician noted a musculoskeletal review of Wiberg's systems was negative. (*Id.* at 283-87) Wiberg was noted to appear uncomfortable and in pain during the physical exam, and the physician found paraspinal tenderness in his right upper back area and right upper cervical spine. (*Id.* at 285-86) A nurse's assessment noted that Wiberg could ambulate without assistance and had a full range of motion in his neck, but that Wiberg reported sharp right-side neck pain and pain under his left scapula. (*Id.* at 287-88) Wiberg was discharged the same day after being advised to get a reumatology work up and being prescribed Flexeril, Ibuprofen and Percocet as needed for pain. (*Id.* at 289-90) However, he was advised by Dr. Douglas Allen to take the medications "on[l]y when absolutely necessary" and that "[y]ou will not find the solution to your problem in a pain pill"; instead, Dr. Allen advised Wiberg to pursue more conservative measures like yoga, massage or chiropractic treatment. (*Id.* at 289)

On February 21, 2008, Wiberg first visited Dr. Koval, complaining of "piercing and shooting" back pain in his upper back, under his right shoulder blade. (*Id.* at 220, 367) Wiberg described that the gradual onset of pain had occurred in an intermittent pattern for eight years, and that he used heavy alcohol, marijuana and other drugs to decrease the pain. (*Id.* at 220, 367) Dr. Koval diagnosed Wiberg with Ehlers-Danlos syndrome (affecting Wiberg's wrist, fingers,

5

back and knee) (hereinafter, "Ehlers-Danlos syndrome"), also finding the presence of mitral valve disorders, and an unspecified backache. (*Id.* at 220-21, 367)

On February 22, 2008, Wiberg returned to Dr. Sabbagh's office for a follow up visit on his back pain. (*Id.* at 366, 459) Dr. Sabbagh noted that Wiberg's neurologic exam was normal. (*Id.* at 366, 459) Wiberg exhibited a non-antalgic heel/toe gait and walked without an assistive device during the visit. (*Id.* at 366, 459) Wiberg's MRI looked essentially normal except for a mild disc bulge, which was nevertheless determined to be appropriate for his age. (*Id.* at 366, 459)

On February 25, 2008, Wiberg returned to Dr. Robinson complaining again of back pain in the midline of his back. (*Id.* at 314) Dr. Robinson noted the presence of a bilateral paraspinal muscle spasm, but otherwise noted that Wiberg exhibited a normal range of motion of spines. (*Id.*) She prescribed Percocet and Tramadol for treatment of his Ehlers-Danlos syndrome. (*Id.*)

On February 29, 2008, Wiberg visited Dr. Thomas Fiss Jr., M.D., for a thoracic spine MRI ordered by Dr. Robinson. (*Id.* at 347) Dr. Fiss noted that the spinal cord was normal in size and signal intensity and also noted "Schmorl's nodes . . . in the lower thoracic and upper lumbar spine[,]"; his impression was of an essentially negative study. (*Id.*)

On March 6, 2008, Dr. Koval noted the results of the x-rays that had been taken on Wiberg's spine. (*Id.* at 216) He stated that the results "looked quite normal to this reviewer." (*Id.*) Dr. Koval wrote that he wanted Wiberg to enter a full physical therapy program with aquatics, concluding that "I do not think that the amounts of changes noted on x-ray are really causing him the intensity of pain that he is complaining of." (*Id.*) Dr. Koval recommended over-the-counter Aleve for treatment. (*Id.*)

6

On March 14, 2008, Wiberg returned to Dr. Robinson regarding his neck and back pain. (*Id.* at 316) Dr. Robinson's findings were similar to those at the February 25, 2008 visit. (*Id.*) Dr. Robinson prescribed Naproxen in addition to the previously-prescribed medications for treatment of Wiberg's Ehlers-Danlos syndrome. (*Id.*)

Wiberg returned to Dr. Robinson on March 26, 2008, complaining of neck pain (which Wiberg said was triggered by recent stretching exercises), as well as vomiting, constipation, and sleep problems arising from his neck pain. (*Id.* at 318) Dr. Robinson noted tenderness to palpation over the cervical spine and, *inter alia*, referred Wiberg to a chiropractor for evaluation. (*Id.*)

Wiberg continued to see Dr. Koval, (*id.* at 211-13), and in a May 29, 2008 visit, he told Dr. Koval that prescribed medications had not helped his back and neck pain and that he was interested in trying alternatives, including a TENS unit, a duragesic patch, and Flexeril, (*id.* at 209). Dr. Koval noted that he wished to wean Wiberg off of Percocet and Tramadol, and prescribed Datvocet in an attempt to do so. (*Id.* at 210) He concluded that "[p]hysical therapy is the way to go for this patient[,] including aquatics" and noted that Wiberg himself thought he could perform aquatic therapy "when the ocean warms up[.]" (*Id.*)

On June 10, 2008, Wiberg returned to Dr. Robinson's office for another follow up on his back pain. (*Id.* at 321) Wiberg stated that his symptoms were stable with medication, but that he was unable to find a job. (*Id.*) Dr. Robinson altered Wiberg's prescriptions, but also wrote that she had refused to "fill out disability forms" for Wiberg as she "believe[ed] he can do light duty" work. (*Id.*)

On July 7, 2008, Dr. Robinson wrote a letter of reference stating that she believed Wiberg

needed to see Dr. Clair Francomano, a geneticist based out of Baltimore, Maryland. (*Id.* at 390) Dr. Robinson explained that Dr. Francomano was a "renowned specialist" in Ehlers-Danlos syndrome, and that in light of the fact that Wiberg was suffering from "severe low back pain" she believed "evaluation and treatment by Dr. Francomano [was] imperative." (*Id.*)

On August 21, 2008, Wiberg returned to Dr. Koval stating that he had gone to physical therapy and aquatic therapy, but both had been ineffective. (*Id.* at 207) Dr. Koval noted that Wiberg still reported significant discomfort throughout his thoracic lumbar spine; Dr. Koval reaffirmed his diagnosis of chronic back pain and Ehlers-Danlos syndrome, but noted that mitral valvular disease had now been ruled out. (*Id.* at 208) On August 28, 2008, Wiberg visited the Beebe Medical Center for a 3-Phase Bone Scan examination ordered by Dr. Koval. (*Id.* at 206) The examination report noted no evidence of abnormally increased or decreased activity, and that the bone scan was normal. (*Id.* at 206, 255)

On September 10, 2008, Wiberg returned to Dr. Robinson. (*Id.* at 323) Wiberg stated that he had been "working for a few months" in a job that was "not strenuous[,]" and noted that his neck pain had been worse in preceding weeks, varying from 4 to 9 in its level of intensity. (*Id.*; *see also id.* at 162, 169 (Wiberg noting on November 2008 Function Report that "[i]f it's a work day I'll go either [] at 10:00 am or 4:00 pm, then come home . . . .")) Dr. Robinson noted that Wiberg had visited with Dr. Francomano, who had instructed Wiberg to start Fentanyl pain patches and Lidoderm pain patches, and recommended that he have an x-ray of the cervical spine and MRIs of the cervical spine and brain. (*Id.* at 323)

On September 27, 2008, Wiberg returned to the emergency room at the Beebe Medical Center complaining of shortness of breath and anxiety. (*Id.* at 368) The emergency record noted

8

that Wiberg reported neck pain, back pain, and a history of marijuana abuse. (*Id.* at 368-70) The nurse's report stated that Wiberg admitted he had "acute depression secondary to his being in constant pain from his Ehlers-Danlos condition[,]" and wanted to get counseling. (*Id.* at 368, 431)

On October 5, 2008, Wiberg again returned to the emergency room at the Beebe Medical Center, this time complaining of anxiety, shortness of breath, chest pain, back pain and whole body numbness. (*Id.* at 267) The emergency record noted, *inter alia*, a negative musculoskeletal review of systems. (*Id.* at 268) The nurse's assessment explained that Wiberg was generally ill appearing and vomited bile, and that he otherwise was cooperative, alert, oriented and ambulated without assistance. (*Id.* at 271-72) Wiberg was prescribed Xanax and discharged the same day. (*Id.* at 272)

Two days later, on October 7, 2008, Wiberg returned to Dr. Robinson complaining of anxiety, vomiting, breathing troubles, tingling in the chest, hands, and face, and indicating that the Fentanyl pain patches did not seem to be helping anymore. (*Id.* at 325) Among other things, he told Dr. Robinson that he was exercising, including walking and biking. (*Id.* at 325, 330) He was wearing a neck brace. (*Id.* at 325) Dr. Robinson instructed Wiberg to continue using the Fentanyl patches and prescribed Celexa for depression. (*Id.*) She advised Wiberg to take his medications as prescribed because he had been non-compliant in doing so, and she warned of termination of the doctor-patient relationship if Wiberg did not comply with her instructions. (*Id.*) Wiberg "reluctantly" signed a pain management agreement describing his intent to comply with Dr. Robinson's instructions regarding pain medication. (*Id.* at 325, 388-89)

On October 13, 2008, Wiberg visited Dr. Sarangi for the cervical spine x-ray, cervical

9

spine MRI, and brain MRI (the procedures that Dr. Francomano had recommended). (*Id*. at 242, 245, 323, 353, 337, 343, 345) Regarding the cervical spine x-ray, Dr. Sarangi noted that his impression was that the results were essentially normal. (*Id*. at 337) Regarding the cervical spine MRI, Dr. Sarangi noted that at the C4-C5 level, minimal posterior disc osteophyte complexes were present without resulting in underlying mass effect on the cervical spinal cord, and at the C5-C6 level, minimal bulge of the annulus is present, and that there was no evidence of underlying central canal or neural foraminal stenosis at either of those levels. (*Id*. at 343-44)[3] Finally, regarding the brain MRI, Dr. Sarangi's impression was a normal enhanced MRI of the brain. (*Id*. at 345)[4]

On October 21, 2008, Wiberg returned to Dr. Robinson. (*Id*. at 327) He brought a pain assessment log and information regarding Ehlers-Danlos syndrome with him to the appointment. (*Id*.) He was wearing a neck brace. (*Id*.) Wiberg agreed to stop using marijuana. (*Id*.)

On November 19, 2008, Wiberg again returned to Dr. Robinson's office, and stated that he had stopped using marijuana on October 23, 2008. (*Id*. at 415) Dr. Robinson conducted a urine drug screen and "discussed at length [how Wiberg's use of] profanities while he was venting and not targeting me are not appropriate in this office" and he would be "given [one] more chance [in two] weeks for his THC [drug screen] to be negative" or he would be "dismissed from this office." (*Id*.) Wiberg returned to Dr. Robinson for the follow up drug screening on December 9, 2008. (*Id*. at 413) Dr. Robinson noted that Wiberg's urine was

---

[3]     The cervical spine MRI also "suggest[ed] an incidental mild Chiari type I malformation." (Tr. at 343)

[4]     Like the MRI of the cervical spine, the MRI of the brain "suggest[ed] a mild Chiari type I malformation." (*Id*. at 345)

positive for Oxycodone, but negative for THC, and that he would be seeing Dr. Francomano for pain management. (*Id.*)

On January 14, 2009, Wiberg visited Dr. Robinson again and complained of daily vomiting after taking medication. (*Id.* at 412) She advised him to continue with prescribed medication to combat nausea and ordered other tests regarding his abdominal pain. (*Id.*) This appears to have been Wiberg's last visit with Dr. Robinson.

### b. September 2008-June 2010: Visits with Dr. Francomano, Dr. Henderson, Dr. Stanislav and Dr. Thomas and related physician appointments

As was referenced above, Wiberg first visited with Dr. Francomano, a geneticist, on September 3, 2008, due to Wiberg's prior diagnosis of Ehlers-Danlos syndrome. (*Id.* at 225) Dr. Francomano indicated that Wiberg's primary concern was how to live with Ehlers-Danlos syndrome and with chronic pain management. (*Id.* at 246) Wiberg told Dr. Francomano that he was currently working part-time, outside his home, as a photographer (and that he was also a musician). (*Id.* at 239, 247) He noted that Oxycodone, Hydrocodone, Tramadol, a TENS unit, alcohol and other drugs helped to relieve about 60% of his pain, but that lifting, bending, stretching, extended laying down or sitting, and stress intensified that pain. (*Id.* at 248-49) In all, Wiberg indicated that he was able to carry on normal activity with effort and some symptoms, except as to carrying greater than five pounds, holding up a book to read, or playing guitar (which he was unable to do). (*Id.* at 238) As was previously referenced, Dr. Francomano ordered an MRI of the brainstem, an MRI of the cervical spine, and an x-ray of the cervical spine with obliques. (*Id.* at 225) Dr. Francomano conducted a physical examination of Wiberg, and noted, *inter alia*, a normal tone in Wiberg's upper and lower extremities, hyperextensibility and

11

increased neck mobility. (*Id*. at 359-361, 447) She also recommended physical therapy, use of certain patches for pain relief, low impact sports and exercise, and mindfulness-based stress reduction. (*Id*. at 226)

On December 3, 2008, Dr. Francomano saw Wiberg for a follow up visit. (*Id*. at 468) Dr. Francomano did not conduct a physical exam on this visit, but wrote that Wiberg's pain had been "bad" during the last three days and that he had not been able to get a "pain management practice to take him on." (*Id*.) She noted that Wiberg's MRIs (from October 13, 2008) had shown a "Chiari" malformation. (*Id*.) She wrote that she would take on his pain management "for now[,]" had Wiberg sign a pain medicine contract, and wrote him a prescription for Oxycontin and OxyIR. (*Id*. at 468, 472-73)

On February 10, 2009, Wiberg again returned to the emergency room at the Beebe Medical Center complaining of a severe aching headache. (*Id*. at 399, 402) The emergency record noted that Wiberg "appear[ed] in pain distress" although he was able to move his "neck freely and without obvious neck discomfort." (*Id*. at 400, 403) Wiberg continued to complain of "significant pain despite being treated with Dilaudid" and was then treated with ativan/droperidol to relieve the pain. (*Id*. at 403)

On March 5, 2009, Dr. Francomano spent 45 minutes in "counseling [and] coordination of care" with Wiberg, noting Wiberg's report of headaches "unlike anything he's had before" that were accompanied by nausea, vomiting and an inability to sleep. (*Id*. at 467; *see also id*. at 187) Dr. Francomano noted the need to find a neurosurgeon for Wiberg and again wrote a prescription for Oxycontin and OxyIR. (*Id*.)

Wiberg visited Dr. Francomano for another follow up visit on September 11, 2009. (*Id*.

12

at 498-500) In the one hour visit, Dr. Francomano spoke with Wiberg, reviewed his medical history and performed a "targeted physical exam." (*Id.* at 498) Wiberg reported that he was experiencing "unremitting abdominal pain," severe depression, shoulder numbness, insomnia, headaches, chronic nausea and vomiting; he said that his chronic pain was poorly controlled by his current medication. (*Id.*) Dr. Francomano's impression was that Wiberg was suffering from, *inter alia*, chronic musculoskeletal pain, headaches, and nausea; she suspected that much of his problem was related to craniocervical instability and possible brainstem compression, as well as possible cervical disc disease that may be causing Wiberg's left shoulder pain. (*Id.* at 499) She recommended increasing Wiberg's Oxycontin dosage, stopping the prescription of Tramadol, increasing his Flexeril dosage, and re-prescribing the TENS unit and physical therapy for muscle relaxation. (*Id.*)

Dr. Francomano recommended that Wiberg see Dr. Fraser Henderson, a neurosurgeon. (*Id.*) Wiberg visited Dr. Henderson on October 28, 2009, complaining of severe neck pain, occasional headaches, pain predominantly down the right medial scapular region, subscapular region and low back region. (*Id.* at 577) Wiberg reported that the pain was "so severe that he is unable to work, read, or perform any of his normal activities" and that it "worsened with awkward positions, lifting, [and] pulling[.]" (*Id.*) During Dr. Henderson's examination, he observed that Wiberg was a "good historian[,]" and found, *inter alia*, that Wiberg had a normal gait, greater than normal ability to rotate his neck, a non-tender spine with no sign of scoliosis and normal brain activity. (*Id.* at 578) He noted that Wiberg was "experiencing a great deal of osteoarthritic pain throughout the entire neck and back, also the shoulders, wrists, and hips." (*Id.*) Dr. Henderson reviewed an MRI of the brain and noted the Chiari malformation (a

13

structural defect in the cerebellum) and suggestion of "some atlantooccipital instability"; he concluded that Wiberg had cervical instability and possibly craniocervical instability, with severe craniocervical pains, along with the onset of headaches. (*Id.*)

Wiberg next visited with Dr. Francomano on December 4, 2009, reporting continued severe neck and back pain. (*Id.* at 572) He reported that he "require[d] occasional assistance, but can care for most of my needs." (*Id.*) Dr. Francomano did not perform a physical exam on this visit, but after her 40-minute discussion with Wiberg, she concluded that he "continues to suffer severe neck and back pain." (*Id.* at 573) She noted that Dr. Henderson had ordered an MRI and a CT scan of the neck, and that the MRI results showed "quite dramatic degenerative disc disease and Chiari I malformation." (*Id.* at 572-73) She recommended that Wiberg undergo a sleep study. (*Id.* at 573)

On January 7, 2010, Wiberg first visited with William Thomas, M.D., a neurologist, for his sleep disturbance. (*Id.* at 537) In addition to getting approximately two hours of sleep per day, Wiberg also reported "stabbing" and "shock like" headaches, "burning" back pain, shoulder pain, and a tingling sensation in his shoulders. (*Id.*)

Dr. Henderson again saw Wiberg on January 11, 2010 for a follow up visit, and for review of the CT scan he had ordered. (*Id.* at 579) The scan confirmed the presence of the Chiari malformation, and Dr. Henderson thought that Wiberg's headache and neck pain could be attributed to it. (*Id.*) Dr. Henderson also noted that "at the C5/6 [level], there is a mild flexion injury to the ligaments posteriously resulting in [the] splaying of the spinous processes" and "a small disc bulge and some indentation on the cervical spine[,]" and added that he did not "think

14

the measurement is critical." (*Id.*)[5] He wrote that Wiberg was "so insistent about the presence of instability that [he was] inclined to proceed with a craniocervical fusion stabilization[,]" but wished to get Dr. Francomano's feedback first. (*Id.*) He also opined that "a C5/6 discectomy could relieve some of his pain." (*Id.*)

On January 19, 2010, Wiberg underwent a sleep study. (*Id.* at 570-71) Vikas Batra, M.D., reviewed the results, and his impression was that Wiberg suffered from central sleep apnea "likely due to narcotic use[.]" (*Id.* at 570) Dr. Batra also noted that Wiberg had an Arnold Chiari malformation that can also be associated with central sleep apnea. (*Id.*)

On February 4, 2010, Wiberg visited a new primary care physician, Charles A. Stanislay, M.D., and reported that he needed "support in trying to maintain coordination of care with" Dr. Francomano and Dr. Henderson. (*Id.* at 504, 507) Dr. Stanislay's physical examination revealed a normal gait and musculoskeletal hypermobility. (*Id.* at 506) His assessment listed Ehlers-Danlos syndrome, chronic pain syndrome, "Arnold-Chiari malformation[,]" and osteoarthrosis. (*Id.* at 507)

On February 12, 2010, Wiberg returned to Dr. Thomas, reporting unchanged back pain, headaches, and sleep apnea, (*id.* at 526), and Dr. Thomas recommended that Wiberg undergo another sleep study, (*id.* at 529). Wiberg attempted to follow through with that recommendation on March 30, 2010, but "[v]ery little sleep was seen" because Wiberg "had much difficulty getting comfortable" due to "much neck and upper shoulder [pain][.]" (*Id.* at 549-50)

Wiberg returned to Dr. Francomano on March 5, 2010. (*Id.* at 574) She noted that the

_____

<sup>5</sup>    It does not appear that this CT scan, nor the MRI referenced in the last few paragraphs, are a part of the record.

15

January 2010 sleep study had shown "central apnea" and also reported that Wiberg had "been diagnosed with osteoarthritis in the neck and back, around February 2008." (*Id.*) While more than half of the one hour visit was spent in counseling and coordination of care, Dr. Francomano also performed a physical examination. (*Id.* at 575-76) She recommended pursuing pre-authorization for surgery with Dr. Henderson, noting that she thought it was Wiberg's "best hope for relief from his severe and disabling symptoms." (*Id.* at 574-75)

On April 5, 2010, Wiberg returned to Dr. Stanislay for a preoperative evaluation. (*Id.* at 509) Dr. Stanislay noted that Wiberg felt "well with minor complaints" and was sleeping poorly and experiencing "back and neck pain" and a decreased energy level. (*Id.*) Dr. Stanislay reported that Wiberg was occasionally fidgety but could sit still when needed, and deemed him stable for the intended surgery with Dr. Henderson. (*Id.* at 511, 513)

On April 12, 2010, Wiberg returned to Dr. Thomas for a follow up visit and reported unchanged back pain, headaches, and sleep apnea. (*Id.* at 522) Dr. Thomas recommended that Wiberg begin ASV therapy for his sleep apnea. (*Id.* at 525)

On April 23, 2010, Dr. Henderson performed a "suboccipital craniectomy, reduction of clivo-axial, fusion stabilization, occiput to C3, and harvest of 2 rib grafts." (*Id.* at 581) Wiberg had a post-surgery CT scan of the cervical spine on June 29, 2010 which showed "[c]ervical degenerative disc disease [at C3-4, C4-5, C5-6 and C6-7] with loss of the normal cervical lordosis which does not appear to have significantly changed from prior MRIs." (*Id.* at 591)

On May 12, 2010, Wiberg returned to Dr. Thomas' office for another visit following his surgery. (*Id.* at 515) He reported that his headaches and back pain were improving, but that his sleep apnea remained unchanged. (*Id.*) Dr. Thomas recommended that Wiberg begin CPAP

therapy. (*Id.* at 518)

On June 7, 2010, Dr. Francomano completed a one-page Delaware Health and Social Services Medical Certification form. (*Id.* at 590) On that form, she listed her diagnosis as "Ehlers-Danlos syndrome and chronic pain syndrome" and checked boxes indicating that Wiberg could not work at his usual occupation, nor could he perform any work on a full-time basis for at least 12 months. (*Id.*)

On June 30, 2010, Dr. Francomano filled out a Physical Residual Functional Capacity ("RFC") Assessment. In that document, she stated that Wiberg could lift or carry ten pounds occasionally, less than ten pounds frequently, could stand or walk with normal breaks for a total of less than two hours in an eight-hour workday, must periodically alternate between sitting and standing to relieve his pain or discomfort, and could only use his upper and lower extremities to a limited degree. (*Id.* at 563-64) She wrote that Wiberg "has joint hypermobility and joint instability secondary to his Ehlers-Danlos syndrome" and that lifting or carrying weights greater than 10 pounds was likely to cause joint subluxations or dislocations. (*Id.* at 564) She also explained that Wiberg's inability to stand or sit for a long period of time was a result of his chronic musculoskeletal pain. (*Id.*) Dr. Francomano indicated that Wiberg could never climb ramps, stairs, ladders, ropes or scaffolds, balance, stoop, kneel, crouch, or crawl. (*Id.* at 565) She concluded that Wiberg had manipulative limitations, further noting that his shoulder instability, chronic neck pain and recent craniocervical fusion surgery precluded him from reaching overhead. (*Id.* at 566) She cited certain environmental limitations, particularly that Wiberg should avoid exposure to all hazards (machinery, heights, etc), and even moderate exposure to temperature extremes. (*Id.* at 567) The report noted that Wiberg should avoid

17

concentrated exposure to wetness, humidity, noise, and vibration because of his joint pain and instability, and that his musculoskeletal pain was exacerbated by conditions of extreme humidity. (*Id.*) Dr. Francomano ultimately concluded that Wiberg's "symptoms of chronic musculoskeletal pain [were] attributable to his underlying Ehlers-Danlos syndrome[,]" that the severity and duration of his symptoms were compatible with his diagnosis and that his "reported severity and its effect on function" were compatible with the total medical and non-medical evidence. (*Id.* at 568)

### c. State Agency Physicians

Two state agency physicians also completed an RFC assessment for Wiberg.

On December 15, 2008, Joyce Goldsmith, M.D., reviewed Wiberg's file. (*Id.* at 295-302) Her primary diagnosis was "Ehlers-Danlos Hypermobility Disorder," and she found that in Wiberg's case, this was accompanied by the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk or sit (with normal breaks) for about six hours in an eight-hour work day, and push and/or pull things in an unlimited manner. (*Id.* at 296) Her assessment indicated that Wiberg could occasionally climb ramps or stairs, never climb ropes, ladders, or scaffolds, frequently balance, stoop, and kneel, and occasionally crouch and crawl. (*Id.* at 297) She found no evidence of manipulative, visual, communicative, or environmental limitations. (*Id.* at 298-99) In support of her assessment, Dr. Goldsmith cited the fact that examinations of Wiberg's spine (in December 2007) had been normal, as had a neurological exam and an exam for neck and back pain in February 2008, a rheumatological consult in March 2008 and a bone scan in August 2008. (*Id.* at 296-97) She also noted that Wiberg had a non-antalgic gait, walked without the aid of a device and could do so for a "'long while[,]'" had essentially normal MRI

results, had reported the ability to perform many everyday activities and the ability to lift ten pounds. (*Id.* 296-97, 300) She found Wiberg only "partially credible" in his complaints because "the objective findings do not coincide with the intensity of the alleged pain." (*Id.* at 300)

On May 26, 2009, Dr. Vinod Kataria reviewed Dr. Goldsmith's conclusions, and affirmed them. (*Id.* at 491-97)

## 2. The Administrative Hearing

At an administrative hearing on July 15, 2010, the ALJ heard the testimony of Wiberg and Diana Sims ("Sims"), a Vocational Expert ("VE"). (*Id.* at 27-76) Prior to the beginning of testimony, the ALJ asked Wiberg's attorney a series of questions about the case at the same time; one of the questions was: "Among other things, do you contend any listings are met?" (*Id.* at 31) Wiberg's attorney responded by beginning a brief opening statement, in which she noted that Wiberg had Ehlers-Danlos syndrome, and went on to describe the general nature of Wiberg's pain, his recent surgery and treatment records that the state agency physicians "did not have the opportunity to review[,]" and the nature of Wiberg's visits to Dr. Francomano and Dr. Henderson. (*Id.* at 31-32) In that statement, Wiberg's counsel did not directly respond to the ALJ's question about whether she contended that Wiberg's condition met any listings. (*Id.*)

### a. Wiberg's testimony

Wiberg appeared for the hearing wearing a neck brace that he bought on his own after his recent surgery; he asked to stand up periodically during the hearing because it was uncomfortable to stay seated in one position. (*Id.* at 42-43, 45, 57)

Regarding his work history, Wiberg testified that in 2002 through 2004, he worked at a restaurant, where he bussed tables and washed dishes, and in 2005 and 2006, he worked at an

19

internet café, where he poured coffee, made sandwiches, and helped people with computers. (*Id.* at 36-37) In 2007, he worked as a barback, and also at a warehouse for a company that sold hot sauce and other items; in September of that year, he injured his back by lifting heavy items at the warehouse and had to quit. (*Id.* at 38-39) He worked at a seasonal photography shop in the summer of 2008, where "[n]ear the end" he had to stand and walk for much of the day. (*Id.* at 34–35, 39–40) Wiberg also worked for one month in 2009 at a record store before being fired. (*Id.* at 38) He tried to get a job at the photography store in the summer of 2009, but said the store was not able to rehire him because of his disability. (*Id.* at 39-40; *see also id.* at 204)[6]

When asked why he filed for DIB and SSI in July 2008, Wiberg said he did so because his family's "savings had been taken all out" and he had become "a terrible financial burden" to his family. (*Id.* at 40) He stated: "I've been basically living off my grandfather and mother, and they're both struggling with their own finances." (*Id.*)

Regarding his medical conditions, Wiberg testified that the problem that limited him the most was pain in, on, and around his spine, as well as pain primarily in his upper-middle back and neck. (*Id.* at 41, 45) He indicated that as to the pain in his neck, it was "never-ending" and there was "never a moment" when he was not in a "pretty high amount of pain." (*Id.* at 45) He stated that with medication, his pain level subsides to "five" on a ten-point scale, but without the medication, his pain level is about an "eight," "nine" or "10." (*Id.* at 46) Wiberg stated that his

---

[6]     Indeed, a letter in the record from Wiberg's employer at the photography shop noted that Wiberg had tried hard to do everything asked of him, but that he "fell short on a regular basis due to pain and discomfort." (Tr. at 204) The employer wrote that Wiberg ultimately could not meet the demands of the store, even with accommodation, since he "could not be on his feet for an entire shift, lift heavy items, arrange photographic equipment, or assist with restocking merchandise[.]" (*Id*; *see also id.* at 15)

20

neck pain, as of the time of the hearing, was only slightly better than it had been before his recent surgery. (*Id.*) He also cited his diagnosis of Ehlers-Danlos syndrome, which triggered many side effects, including osteoarthritis, degenerative disc disease and other injuries. (*Id.* at 47) He asserted that the condition caused "never-ending, excruciating pain" in his neck and back and under his right shoulder blade. (*Id.* at 47-48) Wiberg noted that he had a Chiari malformation and that this (in combination with his medication) caused vomiting; he said that since the surgery, he had vomited a few times a week. (*Id.* at 51-53) He indicated that he has worn a neck brace since the surgery and cannot turn his head side to side since the surgery. (*Id.* at 45-46) He further stated that his sleep improved after the surgery and that he currently slept one to three hours per night, but that he continues to suffer from exhaustion, an inability to focus, read or write. (*Id.* at 53-54)

With regard to his mobility, Wiberg indicated that he could no longer walk for long periods of time or stand for longer than forty-five minutes, but that he did not generally have a problem with the stairs. (*Id.* at 55-56) Wiberg affirmed his ability to bend at the waist and kneel on his knees. (*Id.* at 58) He stated that his ability to sit depended on the chair, and fluctuated between five minutes and two hours. (*Id.* at 56-57) Wiberg also stated that he can no longer sit at the table for dinner because of his discomfort. (*Id.* at 67-68)

In terms of lifting, Wiberg indicated he could lift nothing heavier than "a gallon of milk" and that Dr. Francomano had told him not to lift anything heavier than ten to fifteen pounds. (*Id.* at 57) During his job at the photography shop, Wiberg indicated that he lifted less than ten pounds. (*Id.* at 35) In his prior work as a barback he lifted around twenty pounds, and when he was a restaurant worker he lifted between ten and fifteen pounds. (*Id.* at 35-37)

21

Despite his limitations, Wiberg indicated that he could usually dress himself and hold a cup, comb and toothbrush with occasional pain. (*Id*. at 58-59) He testified that he had a driver's license, but had limited ability to drive for more than 20 minutes since his recent surgery. (*Id*. at 33, 67) Wiberg indicated that he could generally take care of his own hygiene, but needed assistance with many household chores. (*Id*. at 61-63) He stated that he could hold a steering wheel and could usually lift his arms over his head, though not for long. (*Id*. at 59) Wiberg also confirmed that he could use his laptop for the Internet and indicated an interest in pursuing online college in the future. (*Id*. at 58-59, 65) He stated that he moves the computer around when he uses it because he cannot sit in one position. (*Id*. at 68-69)[7] While Wiberg used to play musical instruments, he stated that he no longer can without "keeling over in pain" after "two or three minutes." (Tr. at 65)

### b.    Vocational Expert's Testimony

VE Sims next testified. (*Id*. at 69–75) She noted Wiberg's prior work as a barback and a restaurant worker, both of which were "unskilled and medium in exertion." (*Id*. at 71–72) The ALJ asked Sims to consider a hypothetical individual of Wiberg's age at disability onset,

---

[7]      Wiberg had previously described his abilities in other documents that are a part of the record. In a November 2008 Function Report, Wiberg wrote that he had little to no problem with personal care, regularly prepared his own meals, could perform some house and yard work (though he was limited in his ability to raise his arms, lift or do things placing stress on his spine), got around in various ways (including walking or by car), shopped in stores and by computer (albeit for periods of less than an hour), and performed a number of social activities (though "not nearly so often as before my disability really kicked [in]"). (Tr. at 163-66) Wiberg explained how his pain significantly affected him mentally and physically and that it had impacted various abilities, though he noted he could walk "[a] long while" before needing to rest. (*Id*. at 167) In a March 2009 report, Wiberg noted that his pain had left him unable to exercise, that bending over to shave or brush teeth caused extreme pain and that he could not make consistent plans due to his nausea and pain. (*Id*. at 191) He reported that a number of these issues worsened in a June 2009 report. (*Id*. at 198-201)

education level, and work history. The ALJ stated:

> Now, we'll consider a hypothetical person who is approximately
> the age of the claimant, the stated age at the date of onset, which is
> approximately 22 years. This individual has a high school
> education and is able to read, and write, and do . . . at least simple
> math, adding and subtracting. Simple, has an unskilled work
> background. Therefore would require work at a simple unskilled
> level. This individual will start with a light level of exertion. In
> this particular hypothetical, all of the posturals are occasional, but
> there should be no climbing of a ladder, rope, or a scaffold. This
> person should avoid pushing and pulling with the upper
> extremities, as well as avoiding working overhead. With . . . these
> limitations, would you rule out the past relevant work that the
> claimant did?

(*Id.* at 72–73) Sims testified that she would, but stated that there was light and sedentary

unskilled work in the regional and national economy that the hypothetical person could perform.

(*Id.* at 73) At the sedentary level, Sims gave examples of a unskilled document preparer and

unskilled order clerk. (*Id.* at 74)

When questioned by Wiberg's attorney, Sims was asked to examine Dr. Francomano's

RFC Assessment. After doing so, Sims stated that the individual described in that assessment

would not be able to do any of the previously-indicated jobs at the light and sedentary levels. (*Id.*

at 74-75) Sims stated that she based her conclusion on the combination of information provided

in the assessment indicating that the person "would only be able to occasionally lift 10 pounds,

but less than 10 pounds on a frequent basis; only stand and walk for less than two hours; sitting

would have to be alternate sitting/standing to relieve pain and discomfort;" and that the person

would have limitations in the upper and lower extremities. (*Id.* at 75) According to Sims, the

combination of these factors would indicate "no jobs" that the person could perform. (*Id.*)

### 3.   The ALJ's Findings

23

On July 28, 2010, the ALJ issued the following eleven findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2008.

2. The claimant has not engaged in substantial gainful activity since September 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Ehlers-Danlos hypermobility syndrome and Chiari malformation (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he is limited to no climbing ladders, ropes, or scaffolds; no pushing/pulling or working overhead; and simple, unskilled jobs.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 28, 1985 and was 22 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and

416.969(a)).

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.* at 12–21)

## II.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56. In determining the appropriateness of summary judgment, the Court must "review

the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but

not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411

F.3d 118, 124-25 (3d Cir. 2005) (alterations in original) (quoting *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B.   Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but

more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.

2005) (internal quotation marks and citation omitted). In analyzing whether substantial evidence

supports the Commissioner's findings, the Court may not undertake a *de novo* review of the

Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Even if the reviewing court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190–91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision for the purpose of determining whether the correct legal standards were applied. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court's review of legal issues is plenary. *Id.*; *Hipkins v. Barnhart*, 305 F. Supp. 2d 394, 398 (D. Del. 2004).

## III.    DISCUSSION

### A.    Disability Determination Process

The Social Security Act's general DIB program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a); *Sims v. Astrue*, Civil Action No. 12-469-N, 2013 WL 372151, at *2 (S.D. Ala. Jan. 30, 2013). The Social Security Act's SSI program is a separate and distinct program. *Sims*, 2013 WL 372151, at *2. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *Id.* Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C); *Sims*, 2013 WL 372151,

at *2.[8]

A "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3).

To determine whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability

---

[8]     Thus, to demonstrate eligibility for either DIB or SSI, Wiberg was required to show that he was disabled in the relevant period. The federal court's standard of review for SSI cases mirrors the standard applied in DIB cases. *See Sims*, 2013 WL 372151, at *2; *Roby v. Comm'r of Soc. Sec.*, Civil Action No. 12-10615, 2013 WL 451329, at *3 (E.D. Mich. Jan. 14, 2013) (citing cases). Moreover, because the relevant disability-related regulations for DIB cases largely mirror those for SSI cases, except where otherwise necessary, the remainder of this Report and Recommendation will refer only to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599. *See Wadsworth v. Comm'r of Soc. Sec.*, Civil Action No. 10-cv-11216, 2011 WL 4537075, at *1 n.1 (E.D. Mich. May 18, 2011). The corresponding SSI regulations are found at 20 C.F.R. §§ 416.900-416.999, and correspond to the last two digits of the DIB regulation citations (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920). *Id.*

when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, then the Commissioner proceeds to step three, and must compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment meets or equals an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment fails to meet or medically equal any listing, the Commissioner should proceed to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's residual functional capacity is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotation marks and citation omitted). A claimant's residual functional capacity is determined by identifying any functional limitations or restrictions and assessing his or her work-related abilities on a function-by-function basis. 20 C.F.R. § 404.1545(b)-(d). "The claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Plummer*, 186 F.3d at 428 (citation omitted).

If the claimant is unable to return to his or her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude him or her from adjusting to any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden of production is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words, the ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his or] her medical impairments, age, education, past work experience, and residual functional capacity." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a vocational expert. *Id.* (citation omitted).

**B.     Wiberg's Arguments on Appeal**

On appeal, Wiberg presents two arguments: (1) that the ALJ erred at step three of the sequential evaluation process, when she failed to properly specify and analyze the relevant listings for Ehlers-Danlos syndrome; and (2) that the ALJ also erred at step five of the process, when she failed to give Dr. Francomano's opinion proper weight. (D.I. 22 at 13) The Court will address these arguments in turn.

**1.     The ALJ's step three analysis**

Wiberg's first argument is that the ALJ erred at step three of the evaluation process. (D.I. 22 at 14-17) At step three, the claimant bears the burden of showing that his impairment meets or equals a listed impairment, and must prove that his condition meets every criterion in a listing before he can be considered disabled *per se*. 20 C.F.R. § 404.1520(a)(4)(iii); *Sullivan v.*

*Zebley*, 493 U.S. 521, 530 (1990); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000) (citing *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992)).

In determining whether a claimant has met this burden, it is the Commissioner's duty to first identify and specify those listings that potentially apply to the claimant's impairments. *Burnett,* 220 F.3d at 120 n.2; *Bonani v. Astrue*, Civil Action No. 10-0329, 2010 WL 5481551, at *4 (W.D. Pa. Oct. 15, 2010), *report and recommendation adopted*, 2011 WL 9816 (W.D. Pa. Jan. 3, 2011). The Commissioner's obligation to identify the most relevant listed impairments applies even in circumstances where the claimant himself fails to identify any particular listing that he believes is applicable at the administrative level. *See Burnett,* 220 F.3d at 120 n.2 (noting that, in such a circumstance, identifying the most applicable listing is within the "realm of the ALJ's expertise" and "[p]utting the responsibility on the ALJ to identify the relevant listed impairment(s) is consistent with the nature of Social Security disability proceedings").

Next, the Commissioner is required to provide an adequate explanation of her reasoning as to why the identified listings are or are not met or equaled based on the evidence; the explanation must be sufficient to allow for meaningful judicial review. *Burnett*, 220 F.3d at 119–20; *Bonani*, 2010 WL 5481551, at *4. On the one hand, an ALJ cannot satisfy this requirement by simply providing a summary conclusion stating that a claimant's impairment does not meet or equal any listing—if the ALJ otherwise fails to compare the claimant's impairment with closely analogous listed impairments and fails to further articulate the particular reasoning she utilized in coming to the conclusion that no listing was met or equaled. 20 C.F.R. § 404.1526; *Jones v. Barnhart*, 364 F.3d 501, 504-05 (3d Cir. 2004); *Burnett*, 220 F.3d at 119–20; *see also Mercer v. Barnhart*, No. CIV. A. 00-740-SLR, 2002 WL 125684, at *12 (D.

30

Del. Jan. 17, 2002). On the other hand, (although it is preferable that she do so) the ALJ is not required to specifically state the listing number(s) she considered—so long as it is otherwise clear from the record what listing(s) were reviewed, that those were the appropriate listing(s) to consider, and that the ALJ sufficiently explained why the medical evidence did not meet or equal those listing(s)' requirements. *See Scuderi v. Comm'r of Soc. Sec.*, 302 F. App'x 88, 90 (3d Cir. 2008); *Wisniewski v. Comm'r of Soc. Sec.*, 210 F. App'x 177, 180 (3d Cir. 2006); *Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 262-63 (3d Cir. 2006); *Caruso v. Comm'r of Soc. Sec.*, 99 F. App'x 376, 379-80 (3d Cir. 2004); *Jones*, 364 F.3d at 505; *Waters v. Barnhart*, No. Civ.A. 01-712-KAJ, 2004 WL 163702, at *5 (D. Del. Jan. 20, 2004).

In the decision at issue here, the ALJ concluded at step three that Wiberg did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. at 14) The entirety of the ALJ's step three analysis was as follows:

> The claimant's representative stipulated that no listing was met or medically equaled. The State agency physicians, who are skilled and experienced in reviewing records and assessing the impairments and limitations that are documented in those records, concluded that the claimant's impairments did not meet or equal the requirements of any section of Appendix 1. The records that have been submitted since the State agency completed its review do not warrant a different determination at the third step of the evaluation process. No treating or examining physician or psychologist has identified medical signs or findings that meet or medically equal the requirements of any section of Appendix 1. The undersigned has reviewed the records and finds that the claimant does not have impairments which meet or equal the requirements of any section of Appendix 1.

(Tr. at 14–15)

The core of Wiberg's claim here is that the ALJ "absolutely failed to identify the relevant listings, most particularly the musculoskeletal listings 1.02 and 1.04" and, additionally, that the

31

ALJ's decision at step three amounted to an insufficient "conclusory statement" that no listing was met or equaled. (D.I. 22 at 14, 16)[9] Wiberg asserts that, to the contrary, the record evidence, particularly Dr. Francomano's findings, "contradicted" the ALJ's conclusion that the effects of Wiberg's Ehlers-Danlos syndrome did not meet or equal these listings. (Id. at 14, 16-17)

As an initial matter, the Court agrees with Wiberg that the ALJ's step three analysis was legally insufficient. As noted above, even though neither Plaintiff nor his counsel identified a possibly applicable listing prior to or during the administrative hearing, the ALJ, in setting out her decision, was otherwise required to: (1) identify and consider the most relevant listed impairments (here, those that align most closely with the symptoms of Wiberg's Ehlers-Danlos syndrome) and (2) provide an explanation sufficient to demonstrate why Wiberg's medical history did not meet or equal those listings. In her decision, however, the ALJ did not explicitly or implicitly refer to any particular listing. Nor is this a case where the Court, in reviewing the remainder of the ALJ's decision, can readily identify language in that decision clearly indicating that the ALJ was weighing the relevant medical evidence against the specific requirements of any

---

[9]     Wiberg also takes issue with the ALJ's assertion that his attorney "stipulated" below that no listing was met or equaled in this case, asserting that no such stipulation was made. (D.I. 22 at 14) Indeed, the Court can find no such clear stipulation in the record. The closest reference to the issue came at the administrative hearing. In fairness to the Commissioner, the ALJ did directly *ask* Plaintiff's counsel at that hearing whether Plaintiff was contending that a listing was met—it was one of a number of questions the ALJ posed to Plaintiff's counsel at the hearing's start, just before Plaintiff's counsel was to make her opening statement. (Tr. at 31) But in the opening statement that immediately followed, although Plaintiff's counsel did reference Plaintiff's Ehlers-Danlos syndrome and did describe his pain and medical history, she did not directly respond to the listing-related question. (Id. at 31-32) The listing issue did not come up again during the remainder of the hearing. (Id. at 32-76) Under these somewhat ambiguous circumstances, the Court cannot conclude that this exchange should in some way preclude Plaintiff from proceeding forward with his step three-related claim of error here. And indeed, in its briefing, the Commissioner does not assert that any such "stipulation" was made or should have that kind of effect. (D.I. 25)

32

particular listing.[10] *See, e.g., Arroyo v. Comm'r of Soc. Sec.*, 155 F. App'x 605, 607-08 (3d Cir. 2005) (concluding that although the ALJ failed to specifically mention any listed impairment in his decision, he "sufficiently explained his reasoning" in that he "specifically discussed the considerations relevant to two specific listings" in a way that showed he "did in fact consider Listings 1.03 and 1.09"); *Caruso*, 99 F. App'x at 379-80 (coming to the same conclusion, where although the ALJ did not "explicitly identify which Listing he considered[,]" throughout the opinion he "recited and analyzed the criteria under Listing 1.05C[,]" the only possibly applicable listing); *see also Ochs v. Comm'r of Soc. Sec.*, 187 F. App'x 186, 189 (3d Cir. 2006). Lastly (and relatedly), in setting out her step three findings, the ALJ simply stated a conclusion that no listing was met or equaled,[11] without explaining in any detail how or why the decision was reached. *See, e.g., Rivera*, 164 F. App'x at 263 (concluding that an ALJ erred by making only a "conclusory statement" at step three, where the ALJ's step three discussion stated "only that '[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show signs or findings that are the same or

---

[10]     That is not to say that the ALJ did not address certain of the medical evidence of record. The ALJ did cite to specific medical records and physician visits in setting out her step two and step five findings, largely those records and visits dating through late 2008. (Tr. at 12-14, 15-20) And it is not to say that in doing all of that, the ALJ did not at times touch on evidence that is relevant to some of the requirements of Listings 1.02 or 1.04. It is simply to say that at no point is it clear from the ALJ's decision that the ALJ was actually considering whether Wiberg's condition met or equaled any *particular* listing (Listing 1.02, Listing 1.04 or otherwise), nor that the ALJ was articulating how or why any particular listing was not met or equaled.

[11]     Again, the ALJ's conclusion was that: "[n]o treating or examining physician or psychologist has identified medical signs or findings that meet or medically equal the requirements of any section of Appendix 1" and, thus, that "the claimant does not have impairments which meet or equal the requirements of any section of Appendix 1." (Tr. at 15)

equivalent to those of any listed impairment . . . ."); *see also Burnett*, 220 F.3d at 119-20; *Rosa v. Comm'r of Soc. Sec.*, Civil Action No. 12-5176 (JLL), 2013 WL 5322711, at *7-8 (D.N.J. Sept. 20, 2013). This amounts to error at the step three stage.

Nevertheless, as the Third Circuit has explained in *Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 263 (3d Cir. 2006), such error can, in some cases, be harmless. Harmless error exists in this context when, for example, a reviewing court examines the evidence at issue and finds "abundant evidence supporting the [ultimate] position taken by the ALJ, and comparatively little contradictory evidence." *Id; see also Rosa*, 2013 WL 5322711, at *8.

Plaintiff (who, at step three, has the ultimate burden to provide evidence demonstrating that his medical condition does, in fact, meet or equal a listing), asserts that his symptoms from Ehlers-Danlos syndrome at least met or equaled Listings 1.02 or 1.04.[12] (D.I. 22 at 16) Yet Plaintiff does not explain how this is so, nor does he compare any particular medical evidence of record to the particular requirements of those listings. (*Id.*)[13] The Court, for its part, has

---

[12]     *Cf. Pelka v. Astrue*, No. 11 CV 809, 2013 WL 452800, at *1, *8 (N.D. Ill. Feb. 6, 2013) (considering whether claimant, whose Ehlers-Danlos syndrome with associated joint pain was considered a severe impairment, could have met the requirements of Listing 1.02(A)); *Wong v. Astrue*, Civil No. 11-cv-176 (JNE/SER), 2012 WL 602359, at *23 (D. Minn. Feb. 7, 2012) (same).

[13]     *See Boggs v. Colvin*, Civil Action No. 13-1229, 2014 WL 1670892, at *19 (W.D. Pa. Apr. 28, 2014) (noting that although the ALJ "summarily concluded" that Listing 1.04A had not been met, "[c]ourts analyzing Listing 1.04A have concluded that a claimant must point to evidence which establishes all of its criteria to demonstrate legal error warranting a remand"); *Tichon v. Astrue*, Civil Action No. 08-17, 2009 WL 1174670, at *2-4 (W.D. Pa. Apr. 29, 2009) (noting, prior to explaining why the ALJ's conclusory analysis at step three was "at best, harmless error" that plaintiff bore "responsibility to establish that her skin disorder equaled a listed impairment" and "did not make this showing before the ALJ [and] has not given the [c]ourt reason to believe that she could fare better on remand"); *cf. Smith v. Astrue*, Civil Action No. 12-278, 2013 WL 265240, at *7-8 (W.D. Pa. Jan. 22, 2013).

34

thoroughly reviewed the medical evidence of record. After doing so, it concludes that any error by the ALJ at step three was harmless, as there is abundant evidence demonstrating that Wiberg could not have met the particular requirements of Listings 1.02 or 1.04.

Listing 1.02 requires that a claimant experience major dysfunction of a joint with additional associated symptoms, and has two subparts: Listing 1.02(A) and Listing 1.02(B).[14] Listing 1.02(A), *inter alia*, requires that this dysfunction involve a major peripheral weight-bearing joint and result in an "inability to ambulate effectively[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. An "inability to ambulate effectively" is further defined elsewhere as "an extreme limitation of the ability to walk" resulting in "insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the

---

[14]     The full text of Listing 1.02 reads as follows:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.

35

functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b(1); *see also id.* at § 1.00B2b(2) (noting that examples include the inability to walk without a walker, to walk a block at a reasonable pace on rough surfaces, or to climb a few steps at a reasonable pace with the use of a single hand rail). Listing 1.02(B), *inter alia*, requires dysfunction in a major peripheral joint in each upper extremity, which results in the "inability to perform fine and gross movements effectively[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. An "inability to perform fine and gross movements effectively" is in turn elsewhere defined as "an extreme loss of function of both upper extremities" such that a claimant is incapable of "sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2c (noting that examples include an inability to prepare a simple meal and feed oneself, to take care of personal hygiene, to sort and handle papers or files, or to place files in a file cabinet above waist level).

The record evidence clearly demonstrates that Wiberg could not have satisfied Listing 1.02(A), because he did not suffer from an inability to ambulate effectively. (*See* D.I. 25 at 16 n.6; Tr. at 16) For example, during a visit to Dr. Sabbagh in February 2008, it was noted that Wiberg had a "nonantalgic heel/toe gait" and walked without an assistive device. (Tr. at 366; *see also id.* at 287 (February 2008 emergency room report also noting that Wiberg arrived "ambulatory with steady gait")) During his work at a photography store in summer 2008, he was required to walk for most of the day. (*Id.* at 35) In September 2008, although Wiberg indicated to Dr. Francomano on a form that he sometimes felt random pain while walking, (*id.* at 248), when asked in the same form to describe how his pain interfered with his walking ability on a scale of 0-10 (with 0 meaning "does not interfere" and 10 meaning "completely interferes"),

Wiberg circled "1[,]" (*id*. at 250). In October 2008, Wiberg told Dr. Robinson that he was regularly exercising, including walking and biking, (*id*. at 325, 330), and in November 2008, he wrote that he could walk "[a] long while" before needing to rest, (*id*. at 167). Emergency room reports from October 2008 and February 2009 show, respectively, that Wiberg "arrive[d] ambulatory with steady gait to treatment area" and that Wiberg "ambulate[d] without assistance." (*Id*. at 271, 404) Emergency room records from throughout 2008 through 2009 also repeatedly show normal lower extremity functioning, symptoms that are generally incompatible with ineffective ambulation. (*Id*. at 258, 269, 286, 374, 400, 432) Dr. Henderson's October 2009 examination notes and Dr. Stanislay's February 2010 examination notes both indicate a normal gait. (*Id*. at 506, 578) And the ALJ noted that at the administrative hearing, Wiberg appeared to be walking normally. (*Id*. at 18)[15]

Similarly, the record evidence demonstrates that Wiberg could not have satisfied Listing 1.02(B), because he did not suffer during the relevant time period from an inability to perform fine and gross movements effectively. Emergency room reports from October 2008 and February 2009 cite normal upper extremity function and an absence of motor deficits. (*Id*. at 269, 286, 400) In a November 2008 function report, Wiberg noted little to no problems with maintaining personal care and hygiene, that he regularly prepared his own meals involving "[a]ll [k]inds" of food (while avoiding lifting heavy items) and could perform many different types of house and yard work (although he was limited in his ability to raise his arms or to lift items in doing so).

---

[15] During the administrative hearing, Wiberg did state that "I don't do a whole lot of walking anymore" and that walking for long periods is "not really doable[.]" (*Id*. at 56) But Wiberg was able to "ambulate[] normally into and out of the hearing room[,]" (*id*. at 18), noted that it was easier to walk than to stand still, and explained that he had no difficulty in climbing stairs, (*id*. at 56).

(*Id.* at 163-64) In a November 2009 appointment with Dr. Francomano, Wiberg reported that

though he required occasional assistance he could "care for most of my needs." (*Id.* at 572)

Moreover, during the administrative hearing, Wiberg explained how he could then dress himself,

hold a telephone and a cup and a toothbrush (though he noted that brushing teeth was painful),

use his laptop, grasp a steering wheel, write down appointments, lift his arms above his head

(though not for a long time), lift about 10-15 pounds, reach in front of him, care for his own

hygiene (though he needed some assistance with cutting hair or shaving) and make his own

meals ("[m]ost of the time"). (*Id.* at 18, 57-62)[16] While the record evidence demonstrates

limitations on Wiberg's use of his upper extremities (worsening over time), it does not evidence

the "extreme loss of function" required by Listing 1.02(B), rendering one incapable of carrying

out the basic activities of daily living. *See Lewis v. Astrue*, No. 10-CV-05061-EJD, 2012 WL

1067397, at \*2, \*5 (N.D. Cal. Mar. 28, 2012) (finding that the plaintiff did not meet Listing

1.02(B), despite suffering from numbness in her hands and symptoms of radiculopathy in her

right arm, where the plaintiff was capable of caring for her personal hygiene and engaging in

daily living activities such as light cooking and cleaning).

As for Listing 1.04, it provides:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus,
> spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative
> disc disease, facet arthritis, vertebral fracture), resulting in
> compromise of a nerve root (including the cauda equina) or the

---

[16]     In her RFC assessment, Dr. Francomano does indicate that Wiberg has "limited"
handling and fingering abilities that involve fine and gross "manipulation," and a "limited"
ability to reach, caused by his hand and finger pain. (*Id.* at 566) She also notes a "limited"
ability to push and/or pull in his upper extremities. (*Id.* at 564) The evidence of record,
however, including Dr. Francomano's opinion, does not demonstrate that these limitations
approach the "extreme" loss of function required to meet Listing 1.02(B).

spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-
> anatomic distribution of pain, limitation of motion of the spine,
> motor loss (atrophy with associated muscle weakness or muscle
> weakness) accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg raising test
> (sitting and supine);

or

> B. Spinal arachnoiditis, confirmed by an operative note or
> pathology report of tissue biopsy, or by appropriate medically
> acceptable imaging, manifested by severe burning or painful
> dysesthesia, resulting in the need for changes in position or posture
> more than once every 2 hours;

or

> C. Lumbar spinal stenosis resulting in pseudoclaudication,
> established by findings on appropriate medically acceptable
> imaging, manifested by chronic nonradicular pain and weakness,
> and resulting in inability to ambulate effectively, as defined in
> 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. The medical record evidence demonstrates that Wiberg

could not have met or equaled any part of this listing.

For example, as to Listing 1.04(A), Wiberg's medical records show no evidence of the

nerve root compression that is necessary to meet the listing. *See Garrett v. Comm'r of Soc. Sec.*,

274 F. App'x 159, 163 (3d Cir. 2008). Dr. Sarangi's report from February 2008 notes "no acute

compression deformities involving the lumbar vertebral bodies[,]" and does not otherwise note

the existence of nerve root compression. (Tr. at 452) His report from October 2008 regarding

the cervical spine is similar. (*Id.* at 343) Moreover, while a limitation of the motion of the spine

can be evidence of nerve root compression, in February 2008, Dr. Robinson described a normal

range of motion in the spine, (*id.* at 314), and Dr. Koval, though noting that Wiberg had back

pain, mentioned no limitation of motion of the spine, (*id.* at 367). Emergency room reports from February and October 2008, respectively, similarly note spinal pain and tenderness, but do not mention accompanying limitation of motion. (*Id.* at 267, 283, 286) In October 2009, Dr. Henderson noted that "[c]ervical range of motion is far greater than normal." (*Id.* at 578) Additionally, the medical records from 2008 through 2010 do not suggest that motor loss or muscle weakness, which can also be symptoms of nerve root compression, were present. (*Id.* at 231, 291, 372, 438, 454, 506, 524)

Wiberg has not been diagnosed with spinal arachnoiditis, which is a necessary condition to qualify for Listing 1.04(B). 20 C.F.R. Pt. 404, Subpt. P, App. 1; *Johnson v. Comm'r of Soc. Sec.*, 263 F. App'x 199, 203 (3d Cir. 2008); *see also Garrett*, 274 F. App'x at 163. Nowhere in Wiberg's extensive medical records is a reference to spinal arachnoiditis found. Neither medical records that discuss Wiberg's back problems, (Tr. at 267, 283, 286, 291, 537-38, 577-78), nor records from Wiberg's spinal exams in January and December 2007, February 2008, October 2008 or June 2010, nor his bone scan in August 2008, (*id.* at 206, 252-53, 343-44, 348-49, 462, 591), mention the presence of this spinal disorder.

Listing 1.04(C) requires that the claimant have lumbar spinal stenosis resulting in an inability to ambulate effectively. *See Garrett*, 274 F. App'x at 163. There is significant medical evidence of record to support the conclusion that Wiberg did not suffer from lumbar spinal stenosis. (*See* Tr. at 206, 252-53, 343-44, 348, 462, 591; *but see id.* at 348 (February 2008 MRI analysis of lumbar spine indicating evidence of "mild bilateral recess stenosis")) Regardless, as described above in conjunction with the Court's discussion of Listing 1.02(A), the record does not contain evidence that Wiberg had an inability to ambulate effectively during the relevant time

40

periods, which is another condition required for Listing 1.04(C) to be met.

For these reasons, Wiberg's medical records provide "abundant evidence" supporting the conclusion that he could not have met the requirements of Listings 1.02 and 1.04—the listings he contends are most applicable to his condition of Ehlers-Danlos syndrome. *Rivera*, 164 F. App'x at 263. Thus, any error committed by the ALJ in setting out her step three findings is harmless, and does not warrant remand.

## 2. The ALJ's step five analysis

Wiberg next argues that the ALJ did not give Dr. Francomano's opinion appropriate weight, and erred by placing more weight on the opinions of Wiberg's other doctors and the state agency physicians. (D.I. 22 at 17) Plaintiff states that because Dr. Francomano was a treating physician and a specialist who focused on Ehlers-Danlos syndrome, the ALJ should have credited Dr. Francomano's opinion that Wiberg was disabled. (*Id.*) He further emphasizes that the majority of Dr. Francomano's medical records (and other records she relied on, such as those generated by neurosurgeon Dr. Henderson) were created well after those other doctors and state agency physicians had already rendered their opinions. (*Id.* at 17, 19-20; D.I. 27 at 7)

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429); *see also Dougherty v. Astrue*, 715 F. Supp. 2d 572, 580 (D. Del. 2010). The applicable Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating
> sources, since these sources are likely to be the medical

41

professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations . . . .

20 C.F.R. § 404.1527(c)(2); *see also* 20 C.F.R. § 416.927(c)(2);[17] *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir. 2001); *Ongay v. Astrue,* Civil No. 09-0610 RMB, 2010 WL 5463070, at *9 (D. Del. Dec. 29, 2010).

These regulations state that if a treating source's opinion as to the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." 20 C.F.R. § 404.1527(c); *see also* SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). A final disability determination must not conflict with an opinion deserving of controlling weight. *Mayo v. Astrue,* Civil Action No. 10-792-RGA, 2012 WL 3185418, at *8 (D. Del. Aug. 3, 2012). To that end, an ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales,* 225 F.3d at 317 (internal quotation marks and citations omitted).

In evaluating Wiberg's argument here, the Court will separately consider each of two time periods. The first period is the time frame for which Wiberg is eligible for DIB—September 1, 2007 to September 30, 2008. In this time period, Wiberg was primarily treated by his primary care physician, Dr. Robinson, an orthopedic specialist, Dr. Sabbagh, and a

---

[17]    The identical applicable regulations for SSI disability cases are found at 20 C.F.R. § 416.927(c). Again, simply to avoid repetition, the Court will mainly refer only to Section 404.1527 hereafter.

rheumatologist, Dr. Koval. The second period, running from October 1, 2008 to July 28, 2010, is the remainder of the relevant time period in this case; if found to be disabled in this time period, Wiberg would not be eligible for DIB, but would be eligible (if otherwise qualified) to receive SSI. In this second time period, Wiberg was largely treated by Dr. Francomano and Dr. Henderson.[18]

### a. September 1, 2007 to September 30, 2008

Dr. Francomano saw Wiberg once near the end of this first time period, at an initial consultation on September 3, 2008. (Tr. at 225) Over a year and a half (and several visits) later, on June 7, 2010, Dr. Francomano opined that Wiberg could not perform any work on a full-time basis. (*Id.* at 590) In light of this, the Court strongly doubts that Dr. Francomano intended her opinion as to Wiberg's disability status to apply to this first time period—a time in which, in essence, she did not treat Wiberg.

Nevertheless, for the sake of completeness, the Court will assume that Plaintiff is contesting the ALJ's decision not to give Dr. Francomano's treating opinion controlling weight as it relates to this time period—that in which Wiberg could claim DIB. To the extent that this is a part of Plaintiff's argument, the Court concludes that substantial evidence supports the ALJ's contrary decision that Wiberg was not disabled during this time period. The Court does so for a few primary reasons.

First, near the end of the time period, on June 10, 2008, Dr. Robinson explicitly refused

---

[18]     There is almost no overlap among treatment providers in these two periods. For example, as is discussed further below, Dr. Robinson's treatment relationship with Wiberg ended shortly after September 30, 2008. And Dr. Francomano's treatment relationship with Wiberg began less than a month before October 1, 2008, extending up through the July 2010 administrative hearing.

to sign disability forms for Wiberg, because she believed he could do not only sedentary work, but also light duty work. (*Id.* at 17, 321) "While an ALJ should give appropriate weight to the opinions of treating physicians, an ALJ cannot give controlling weight to the opinions of all treating physicians if their conclusions are inconsistent." *Snyder v. Astrue*, Civil Action No. 12-1029-RGA, 2013 WL 5435576, at *5 (D. Del. Sept. 30, 2013). And again, in contrast to Dr. Robinson, who had seen Wiberg on numerous occasions during this September 2007 to September 2008 stretch, Dr. Francomano did not see Wiberg at all, save for one introductory visit in the period's last month. Thus, if one is focusing only on the DIB disability determination and this first time period, it is understandable why the ALJ would credit Dr. Robinson's opinion that Wiberg could perform light work over the opinion of Dr. Francomano, since the latter had not yet developed the treating relationship with Wiberg that she later would.

Second, the record contains evidence that other physicians (aside from Dr. Robinson) who treated Wiberg during this first time period believed that: (1) Wiberg was over-reporting the nature of his limitations; and (2) could engage in a level of treatment that involved some significant physical activity. (Tr. at 17) This includes the February 2008 statement of emergency room physician Dr. Allen, who told Wiberg that "[y]ou will not find the solution to your problem in a pain pill" and that Wiberg should try yoga, massage or other similar treatments for relief. (*Id.* at 289) It also includes Dr. Koval's repeated, pointed conclusions in 2008 that the changes noted on Wiberg's x-rays were not causing him the intensity of pain Wiberg was complaining of, (*id.* at 216), that "[p]hysical therapy is the way to go for this patient, including aquatics[,]" and that "over the counter Aleve at one tablet twice a day" for pain was appropriate pain management treatment, (*id.* at 210, 216). The ALJ could reasonably have concluded that, during this late 2007

44

to late 2008 time period, these physicians' apparent skepticism as to Wiberg's level of limitation, as well as the robust nature of the treatment they recommended, was inconsistent with the notion that Wiberg could perform no substantial gainful work. *See e.g.*, *Daniello v. Colvin*, Civ. No. 12-1023-GMS-MPT, 2013 WL 2405442, at *17 (D. Del. June 3, 2013) (stating that the plaintiff's "relatively conservative degree of treatment[,]" consisting of primarily pain medications, was consistent with the ALJ's finding that the plaintiff was not disabled).

Third, Wiberg's work history during this first time period could, as the ALJ noted, (Tr. at 17-18), contradict the assertion that Wiberg was unable to work in even a sedentary unskilled job. *See* 20 C.F.R. § 404.1571. Wiberg worked at a photography shop from approximately June 2008 until September 2008, and in that position he occasionally lifted up to ten pounds and at times had to stand and walk for a good part of the day. (Tr. at 34-40, 239, 247, 323); *see Daniello*, 2013 WL 2405442 at *17 (citing the plaintiff's part-time work in which she needed assistance with lifting as supporting an ALJ's finding of non-disability); *see also Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 374, 375 (3d Cir. 2009).

And fourth, there is an opinion from state agency physician Dr. Goldsmith, issued in late 2008, just after the DIB period closed, in which Dr. Goldsmith determined that Wiberg could perform some amount of work. (Tr. at 295-302) That opinion (later summarily affirmed by Dr. Kataria) relied exclusively on medical records and examinations provided in the late 2007 and 2008 time period. As the ALJ noted in her decision, *(id.* at 16-17), Dr. Goldsmith relied upon x-rays, bone scans and Wiberg's statements from this time period that provide evidence indicating that the effects of Wiberg's impairments were not so severe that they precluded all substantial, gainful work activity.

45

In sum, the opinions and recommendations of certain of Wiberg's other treating physicians, the content of Wiberg's medical records, Wiberg's job history, and the opinions of state agency physicians, together provided substantial evidence to support the ALJ's conclusion that Wiberg was not disabled during this first time period. To the extent Dr. Francomano's opinion was intended to assert that Wiberg was disabled during this period of DIB eligibility, the ALJ's decision to provide that opinion less than controlling weight was supported by substantial evidence.

Thus, the Court recommends that the ALJ's decision that Wiberg is not entitled to DIB be affirmed.

**b. October 1, 2008 to July 28, 2010**

It is almost a certainty, however, that Dr. Francomano's opinion was *not* intended to relate to that first time period. That is because, again, nearly the entirety of her treating relationship with Wiberg (and all of Wiberg's visits with Dr. Henderson) occurred during the second time period—from October 1, 2008 up through the date of the administrative hearing. Instead, what Dr. Francomano's opinion *does* clearly seem meant to assert is that in this second time period (i.e., for SSI eligibility determination purposes), Wiberg was disabled.

For the reasons discussed below, the Court finds that as to this second time period, there was not substantial evidence to support the ALJ's decision to give Dr. Francomano's opinion less than controlling weight. Said differently, the record relating to this time period clearly demonstrates that Dr. Francomano's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. 416.927(c)(2). It should have been given controlling

46

weight.

In declining to accord "significant weight" to Dr. Francomano's opinion of disability, the ALJ concluded that, *inter alia*, it "contrast[s] sharply with and [is] without substantial support from other evidence." (Tr. at 19-20) Yet nearly the entirety of the medical record evidence that the ALJ discussed just prior to assessing Dr. Francomano's opinion, (*id.* at 16-19), was from the late 2007 to late 2008 time period. Thus, in concluding that Dr. Francomano's opinion "contrast[ed] sharply" with other medical "evidence," the "evidence" the ALJ was referring to did not cover most of the nearly two year period—from late 2008 through mid-2010—in which Dr. Francomano actually treated Wiberg.

By way of just one example, prior to assessing Dr. Francomano's opinion, the ALJ referenced the opinions of three physicians who concluded that Wiberg could perform at least some work: Dr. Robinson's opinion dated June 10, 2008, Dr. Goldsmith's opinion dated December 15, 2008, and Dr. Kataria's opinion dated May 26, 2009. (*Id.* at 296, 303, 321, 493, 497) Yet none of these physicians were interpreting or opining on the state of the medical evidence as to Wiberg's health in late 2008, 2009 or 2010. Dr. Robinson, for example, saw Wiberg only a few times after September 30, 2008, with her last visit coming on January 14, 2009. None of Dr. Robinson's treatment notes from these few visits specifically address Wiberg's ability (or inability) to work. (*Id.* at 325-28, 412-17) As for state agency physician Dr. Goldsmith, as previously noted, when she submitted her opinion on December 15, 2008, she cited almost exclusively to medical evidence from the first time period. (*Id.* at 296-97) Dr. Goldsmith's report does not reference either of the two visits that Wiberg had with Dr. Francomano as of the date of her report. (*Id.*) It does not reference Wiberg's cervical spine MRI

47

from October 2008, showing minimal posterior disc osteophyte complexes at the C4-C5 level, minimal bulge of the annulus at the C5-C6 level, and suggestion of a Chiari malformation. (*Id.* at 296-97, 343-44) And it obviously could not reference any of the subsequently-developed medical evidence from 2009 or 2010. And the opinion of Dr. Kataria, the second state agency physician, is based on his review of Dr. Goldsmith's conclusions and the evidence Dr. Goldsmith assessed (as well as the records from a single February 2009 emergency room visit by Wiberg). (*Id.* at 492-93)

Tellingly, in the part of the decision in which the ALJ concludes that Dr. Francomano's opinions "contrast sharply" with the other evidence of record, only one specific example is cited: that "the claimant testified that he performed postural activities as part of his most recent job, even though he was undergoing treatment by Dr. Francomano at the time." (Tr. at 20) The ALJ's statement here must be intended to reference Wiberg's work at the photography shop in the summer of 2008. (*Id.* at 34-35) But that job essentially ended at just about the time when Dr. Francomano began seeing Wiberg in September 2008; thus, Wiberg's work in that position does not really speak to the extent of his abilities in the bulk of this second time period. In fact, the record shows that when Wiberg later attempted to get rehired by the photography shop in the summer of 2009, (*id.* at 39-40), the shop owner concluded that she could not employ him. This was because Wiberg could not perform the requisite tasks, including being "on his feet for an entire shift," lifting certain items and arranging and restocking photographic equipment, (*id.* at 204).

It is not necessarily error for an ALJ to make a determination that a claimant was not disabled up through mid-2010 by relying on medical evidence and physician opinions from 2007

through 2008—so long as the claimant's medical condition did not meaningfully change after those 2007 and 2008 opinions were issued. *See, e.g., Smith v. Astrue*, 961 F. Supp. 2d 620, 644-45 (D. Del. 2013) (finding that ALJ's reliance on state agency physician opinion rendered in June 2007, over a year before the close of the disability period, was not in error, where none of the events that occurred thereafter would be likely to have altered that opinion and none of claimant's physicians who treated him after June 2007 proffered a conflicting opinion) (citing cases). But here, the record demonstrates that Wiberg's condition did change—it deteriorated during this second time period.

For example, the medical record from late 2008 through mid-2010 documents how Wiberg was diagnosed for the first time with two additional conditions connected to certain of his symptoms. First, Wiberg's Chiari malformation—which the ALJ deemed to be a "severe impairment"—was discovered by Dr. Francomano in December 2008. (*Id.* at 12, 468) It was later confirmed by an MRI and CT scan of the brain reviewed by Dr. Henderson. (*Id.* at 578-79) The record describes how Wiberg's headaches, neck pain, instability, and sleep apnea were all linked to the presence of this Chiari malformation. (*Id.* at 570, 579) Wiberg also testified that his frequent nausea and vomiting were symptoms of the condition. (*Id.* at 51-52) These problems led to Wiberg's April 2010 craniectomy and fusion stabilization surgery—a procedure that Wiberg's attorney highlighted as a recent development at the administrative hearing. (*Id.* at 32, 41)

Additionally, diagnostic studies of the cervical spine during this second time period showed problems at multiple levels, including cervical degenerative disc disease. (*Compare id.* at 343-44 (October 2008 cervical spine MRI showing minimal posterior disc osteophyte

49

complexes at the C4-C5 level and minimal bulge of the annulus at the C5-C6 level), *with id.* at 572-73 (Dr. Francomano indicating in December 2009 that recent MRI of the cervical spine showed "quite dramatic degenerative disc disease"), *id.* at 579 (Dr. Henderson reporting in January 2010 that recent CT scan of the cervical spine showed a "small disc bulge and some indentation on the cervical spine" at the C5-C6 level) *and id.* at 591 (June 2010 CT scan of the cervical spine showing degenerative disc disease at the C3-C4, C4-C5, C5-C6 and C6-C7 levels with the loss of normal cervical lordosis)) Indeed, Dr. Henderson opined that a C5-C6 discectomy could relieve some of Wiberg's pain (but noted that he wished to proceed first with the craniocervical surgery). (*Id.* at 499, 573, 579)

These changes reflected in the medical record also gibe with Wiberg's own description of how his symptoms worsened during this period, contained in reports submitted to the Commissioner. For instance, in a July 28, 2008 Disability Report, Wiberg reported that "constant pain in [his] neck and back" limited his ability to work. (*Id.* at 149) In a subsequent report completed in March 2009, Wiberg indicated that as of December 2008, his condition had worsened, as he was experiencing increased neck and upper back pain as well as increased nausea and vomiting. (*Id.* at 185, 187) Wiberg also reported that his daily activities had changed since the last report because his pain and nausea were interfering with his ability to make plans, he was unable to exercise, and bending over to shave or brush his teeth caused "extreme pain." (*Id.* at 191) A third Disability Report completed in June 2009 further reflected Wiberg's deteriorating condition, as he reported continued pain, nausea, and difficulty sleeping, and described more frequent bad days in which he was unable to "leave the house, shower, dress,

50

anything." (*Id.* at 198, 201)[19]

Wiberg's deterioration in this period is also reflected in his discussions with his physicians. For example, in a September 2008 Pain Inventory that Wiberg completed for Dr. Francomano, Wiberg indicated that his medications provided 60% relief for his pain. (*Id.* at 249) And in a Pain Diary for the week of October 16, 2008, Wiberg recorded pain scores ranging from 5 to 8 (on a scale of 1 to 10, with 10 reflecting the worst pain imaginable). (*Id.* at 377) However, by March 5, 2009, Wiberg was reporting to Dr. Francomano that he had recently experienced a severe headache unlike anything he had experienced before. (*Id.* at 467) In a Pain Diary for the week of March 16, 2009, Wiberg began recording pain scores ranging from 6 to 10, with 9 being the most frequent score that week. (*Id.* at 469) By September 2009, Wiberg's discussion with Dr. Francomano led her to write that his "[c]hronic pain syndrome is poorly controlled on [his] current medical regimen." (*Id.* at 498) And in October 2009, Wiberg reported to Dr. Henderson that his pain was "so severe that he is unable to work, read, or perform any of his normal activities." (*Id.* at 577)

Just as it is clear from the record that Wiberg's condition changed from late 2008 through mid-2010, it is also clear that these very changes related to Dr. Francomano's June 2010 opinion

---

[19]     Likewise, while Wiberg had reported "[f]ew problems cooking, except for lifting things" and being able to walk for a "long while" in November 2008, (Tr. at 163, 167), by the time of the July 2010 hearing, he testified that he was able to make his own meals "[i]f they don't involve cooking" and that walking for long periods of time was "not really doable[,]" (*id.* at 56, 62). Wiberg also indicated in November 2008 that in a typical day, he might spend an afternoon recording music. (*Id.* at 162-63) By July 2010, however, Wiberg stated that he had not recorded anything since 2008, and that he could not play some instruments for more than two or three minutes before keeling over in pain. (*Id.* at 65-66)

51

regarding Wiberg's disability.[20] By late 2009, Dr. Francomano was expressing her opinion that "it is my impression that [Wiberg] is suffering terribly from chronic musculoskeletal pain, headaches, nausea and constipation[,]" which she clearly attributed to "craniocervical instability and possible brainstem compression" and possible "cervical disc disease[.]" (*Id.* at 499) And then, in completing the June 2010 RFC Assessment for Wiberg, Dr. Francomano linked Wiberg's key physical limitations to his Ehlers-Danlos syndrome, related degenerative disc

---

[20]     Some of the reasons that the ALJ provided for according Dr. Francomano's opinion "less weight" were that "Dr. Francomano apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant" and, relatedly, that "Dr. Francomano did not have the benefit of reviewing the other medical reports contained in the current record." (Tr. at 19) It is not clear from the ALJ's decision what "other medical reports" are being referred to here, or why the ALJ believed that Dr. Francomano did not have access to certain portions of Wiberg's prior medical records. But to the extent that this portion of the decision is meant to assert that Dr. Francomano's opinion was largely divorced from medical testing and a review of medical records, the record does not bear that out. To the contrary, Dr. Francomano's records make clear that, in addition to talking with Wiberg and hearing him describe his symptoms, she also relied on the results of physical examinations and medical testing (often testing that she ordered herself), prior to formulating her conclusions. (*See, e.g.*, *id.* at 242-45 (September 2008 record in which Dr. Francomano, after conducting physical exam of Wiberg, orders MRIs of Wiberg's brainstem and spine, and x-rays of the cervial spine with obliques); *id.* at 468 (December 2008 record in which Dr. Francomano notes her review of Wiberg's MRI results, notices "Chiari" malformation and notes her intent to review the MRI with another physician); *id.* at 467 (March 2009 record in which Dr. Francomano indicates need for Wiberg to be examined by a neurosurgeon); *id.* at 498-500 (September 2009 records in which Dr. Francomano notes that she conducted a physical exam of Wiberg, and recommends that he follow-up with Dr. Henderson); *id.* at 572-74 (December 2009 record in which Dr. Francomano notes that Dr. Henderson had recommended a further MRI and CT of the neck and that a "7 mm Chairi malformation was found on these studies[,]" that Dr. Francomano reviewed the MRI results that demonstrated "quite dramatic degenerative disc disease and Chiari I malformation[,]" and that Dr. Francomano recommended that Wiberg discuss options for surgery with Dr. Henderson and partake in a sleep study); *id.* at 574 (March 2010 records in which Dr. Francomano reviewed Wiberg's medical history, including diagnoses from February 2008, an emergency room visit in February 2009 and a sleep study in January 2010, and conducted a physical examination of Wiberg). In addition, as Wiberg notes, (D.I. 22 at 20), Dr. Henderson submitted his reports (in which Dr. Henderson reviews the results of, *inter alia*, MRIs and CT scans) directly to Dr. Francomano, (*id.* at 577-80).

52

disease and his Chiari malformation. (*Id.* at 564 ("[Due to] joint hypermobility and joint instability secondary to his Ehlers-Danlos syndrome [] [l]ifting [and]/or carrying weights greater than 10 [pounds] is likely to cause joint subluxations or dislocations."); *id.* ("He has chronic musculoskeletal pain that makes sitting or standing for long periods very difficult."); *id.* at 566 ("Shoulder instability and chronic neck pain, as well as his recent craniocervical fusion, preclude reaching overhead."); *id.* at 568) These limitations, in turn, also clearly informed her June 2010 Medical Certification in which she opined that Wiberg was unable to work. (*Id.* at 590) And they are the same limitations which, if fully credited, caused the VE to opine that Wiberg would be unable to perform substantial gainful work activity (and thus, would have been considered disabled). (*Id.* at 75)

In sum, for nearly the entirety of this second time period—the medical evidence generated by Dr. Francomano and from Dr. Henderson (whose findings Dr. Francomano relies upon) was not contrary to the "other substantial evidence in [the] case record[.]" Instead, it (augmented by notes from Wiberg's February 4, 2009 emergency room visit and his handful of visits to Dr. Stanislay and Dr. Thomas) *was* the evidence in the case record as to how Wiberg's condition developed and changed in this time. And this important medical evidence is not grappled with, or really even discussed, in the key portions of the ALJ's decision. (*Id.* at 16-19)

In situations just like these, courts have found that an ALJ's failure to give the treating physician's opinion controlling weight—and instead to credit the contrary opinions of other physicians generated before the occurrence of key intervening medical developments—was

53

error.[21] For instance, in *Pringle v. Astrue*, C.A. No. 08-503-GMS, 2014 WL 2452570 (D. Del. May 16, 2014), the ALJ declined to give a treating physician's opinion controlling weight where it was contradicted by the opinion of state agency physician. *Pringle*, 2014 WL 2452570, at *11. In December 2003, the state agency physician concluded that the plaintiff could perform reasonable activities, including sitting, standing, walking and lifting; but in February 2005, the treating physician found that the plaintiff had a host of physical limitations. *Id.* at *2, *4. While acknowledging that the opinions were indeed inconsistent, the Court found that the ALJ "failed to accord proper weight to the medical opinion and assessment of [the plaintiff's] treating physician." *Id.* at *12. The Court explained that the state agency physician's opinion was issued "long before the record was complete and seven months before [the plaintiff] fell and injured her back." *Id.* at *11. The Court noted that contradictory evidence predating a principal complaint of a claimant cannot outweigh a treating physician's opinion. *Id.* In concluding that the ALJ had erred in discounting the treating physician's opinion, the Court further explained that the record supported that opinion. *Id.* And the Court noted that it was improper for the ALJ to have disregarded the treating physician's opinion generated in the relevant time period solely on the bases of the ALJ's own impression of the record and his evaluation of the claimant's credibility. *Id.* at *12. A myriad of other cases from this District have concluded the same.[22]

---

[21]      This is especially true when such earlier opinions are issued by non-treating physicians who have not personally examined a claimant. *See Bentzen v. Astrue*, — F. Supp. 2d —, 2014 WL 2741021, at *10 (D. Del. June 13, 2014) ("Greater weight should not be afforded the assessment of a physician who has not personally examined a claimant if it conflicts with findings of treating physicians who have.").

[22]      *See also Bentzen*, 2014 WL 2741021, at *9-10 (finding that an ALJ erred in giving significant weight to the opinion of non-examining physician that plaintiff was able to engage in light work, and in affording less weight to contradictory opinion of a treating physician that plaintiff could not work, where the non-examining physician's opinion predated the treating

Here, as in *Pringle* and these other cases, Wiberg's condition did not remain virtually unchanged from the time when the state agency physicians (and Dr. Robinson) rendered their opinions until the time when Dr. Francomano offered hers. Instead, pre-existing symptoms worsened, he was diagnosed with additional conditions that related to his deterioration, and he ultimately had surgery to attempt to improve his condition. It was in this very same period—from late 2008 to mid-2010—that Wiberg was sent to see Dr. Francomano, a "renowned specialist" in the very type of "rare disorder" that Wiberg was suffering from. (Tr. at 390)

Thus, it is not surprising that since Wiberg's status changed after the initial opinions credited by the ALJ, a new treating physician with specialized expertise would have come to a different conclusion than that of those initial opinions.[23] The evidence of record developed during this second time period supports Dr. Francomano's opinion. And the Commissioner

---

physician's examination of plaintiff and a "notable increase in symptoms"); *Alley v. Astrue*, 862 F. Supp. 2d 352, 366 (D. Del. 2012) (finding that ALJ erred in affording more weight to the opinions of the state agency physicians than the plaintiff's treating physicians, where the former opinions were rendered before the plaintiff's back fusion surgery, and before most of the medical exhibits had been submitted into the record); *Morris v. Astrue*, Civ. Action No. 10-414-LPS-CJB, 2012 WL 769479, at *24 (D. Del. Mar. 9, 2012) (finding that ALJ's analysis of state agency physicians' opinions was in error where the ALJ afforded the opinions some weight, even though they were issued years before the record was complete, before the plaintiff was diagnosed with certain of her relevant conditions, and well before a treating physician opined that the plaintiff was disabled); *Dougherty v. Astrue*, 715 F. Supp. 2d 572, 583 (D. Del. 2010) (finding that ALJ erred in rejecting the treating physician's opinion as contradictory to the state agency physician opinion, where the state agency physician never examined the plaintiff, and rendered his RFC "long before the record was complete" and before at least two of the plaintiff's hospitalizations and all of her neurosurgical outpatient procedures).

[23]     Interestingly, while Dr. Francomano opined that Wiberg suffered from greater limitations than did the state agency physicians, as the ALJ highlighted, "even the State agency medical experts agreed that [Wiberg] was limited to less than light exertional level work from the alleged onset date through late May 2009." (Tr. at 13) It follows that if the state agency physicians had the additional benefit of all of the data from Dr. Francomano and Dr. Henderson, their opinion as to the ultimate question of disability might have been different.

certainly has not pointed to specific evidence developed during this second time period that contradicts Dr. Francomano's opinion.[24] In the absence of contradictory medical evidence, an ALJ may not reject a treating physician's opinion based on her own evaluation of a claimant's credibility, speculation, or lay opinion. *Morales*, 225 F.3d at 317. Once the ALJ's assertion that Dr. Francomano's opinion "contrast[s] sharply with" the temporal medical evidence is peeled away, it is clear that the ALJ's decision to reject Dr. Francomano's opinion must have been based on these prohibited factors.[25]

Accordingly, the Court finds that the ALJ failed to accord proper weight to the medical opinion and assessment of Dr. Francomano as it relates to this second time period. Therefore,

---

[24]    In declining to give Dr. Francomano's opinion controlling weight, the ALJ asserted that Dr. Francomano's treatment notes "fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled" such as "no objective documentation of[,]" *inter alia*, "frequent joint dislocation and/or subluxation . . . frequent bruising, severe scarring . . . or severe gum disease." (Tr. at 19) It is not clear from where in the record the ALJ determined that the absence of these particular abnormalities should cast doubt on the legitimacy of Dr. Francomano's conclusions. Regardless, as previously noted, Dr. Francomano's treatment notes reveal that her opinions were based on physical examinations of Wiberg, Wiberg's diagnostic study results, and Wiberg's subjective complaints. (*Id.* at 225-50, 467-68, 498-500, 572-73, 574-76) Thus, in addition to being supported by the treatment notes of Dr. Henderson, Dr. Francomano's opinion is clearly supported by medically acceptable clinical and diagnostic techniques. *See Willis v. Colvin*, Civil Action No. 12-1232-RGA, 2014 WL 3644461, at *5 (D. Del. July 22, 2014). The lack of the particular abnormalities referenced by the ALJ "neither contradicts [the treating physician's] medical opinions nor does it indicate that [her] examinations are less than medically acceptable." *Id.*

[25]    For instance, the ALJ notes the "possibility" that Dr. Francomano—an established medical expert in this field—"express[ed her] opinion" as to Wiberg's disability status not because she considered it to be a medically correct opinion, but instead either because: (1) Dr. Francomano "sympathize[d]" with Plaintiff or (2) she offered the opinion "in order to satisfy [Plaintiff's] requests and avoid unnecessary doctor/patient tension." (Tr. at 20) Both suggestions are, on their face, blatantly speculative. Thus, they could not serve as a proper basis to reject Dr. Francomano's opinion. (*Id.* (ALJ noting, as to her suggestion in this regard, that it is "difficult to confirm the presence of such motives")); *see also Bentzen*, 2014 WL 2741021, at *9 (noting that an ALJ may not reject a treating physician's opinion based on "'speculative inferences from medical reports'") (quoting *Plummer*, 186 F.3d at 429).

the Court concludes the ALJ's decision that Wiberg was not entitled to SSI because he was not disabled is in error and was unsupported by substantial evidence in the record.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Wiberg's motion for summary judgment be GRANTED-IN-PART and DENIED-IN-PART, and that the Commissioner's motion for summary judgment be DENIED. The Court further recommends that regarding Wiberg's application for SSI, the case be remanded for any further proceedings necessary, consistent with this Report and Recommendation.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: August 22, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

57